## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| RICARDO CORPORAN, | |
| Plaintiff, | |
| v. | CIVIL ACTION FILE NO. |
| ALSTON AND BIRD LLP | **JURY TRIAL REQUESTED** |
| Defendants. | |

## COMPLAINT

COMES NOW Plaintiff Ricardo Corporán ("Mr. Corporán" or Plaintiff), by and through his undersigned counsel, and sets forth this Complaint against Defendant Alston and Bird LLP ("Alston and Bird" or Defendant) for damages under the Fair Labor Standards Act, 29 U.S.C Section 201 et seq., (FLSA), O.C.G.A Section 51-6-1 et seq., and for declaratory and injunctive relief, as set forth below.

## INTRODUCTION

1.     This is a civil rights action for discrimination and retaliation in violation of the Fair Labor Standards Act, 29 U.S.C Section 201 et seq. ("FLSA"), to vindicate Plaintiff's rights, and to make him whole. Plaintiff seeks declaratory and injunctive relief, damages, attorney's fees and costs.

## JURISDICTION AND VENUE

2.     This action is for interference and retaliation against Plaintiff's rights arising under the protections provided by the FLSA, as well as pendant state law claims. Plaintiff seeks declaratory and injunctive relief, back pay, front pay, liquidated damages, compensatory damages, punitive damages, and attorney's fees and costs, in addition to damages for other causes of action asserted below. This court has jurisdiction over present matter pursuant to 28 U.S.C. § 1331.

3.     Venue is appropriate in this Court as upon information and belief the events complained of herein occurred within the geographic boundaries of the U.S. District Court for the Northern District of Georgia and upon information and belief all parties to this action reside within the geographic boundaries of the United States District Court for the Northern District of Georgia. Venue is proper pursuant to 28 U.S.C. § 1391 (b) and (c).

## PARTIES

4.     Defendant Employer is a Domestic Limited Liability Company registered to conduct business in the state of Georgia.

5.     Defendant Employer may be served through its registered agent, Alston and Bird LLP, 1201 West Peachtree Street, Atlanta, GA, 30309-3424, USA, Fulton County, if service of process is not waived.

6.  This court has personal jurisdiction over Defendant.

2

## FACTUAL ALLEGATIONS

7.     From June 2013 to September 2021, Defendant was Plaintiff's employer under the FLSA.

8.     At all times during Plaintiff's employment, and for all positions with Defendant, Plaintiff was classified as a nonexempt worker under the FLSA, entitled to overtime pay for all hours worked.

9.     At all times during Plaintiff's employment, and for all positions with Defendant, Plaintiff submitted time records through DayForce, which involved manually entering time into the system which would later be reviewed and approved by the Plaintiff's supervisor.

10.     From June 2013 to July 2015, Plaintiff was a Resource Center Clerk reporting to Human Resources Manager Sue Wynn, who reported to Human Resources Director Michael Stephens.

11.     On or about July 2015, Plaintiff was promoted to Resource Center Assistant and served in that role from July 2015 to January 2016, reporting to (then) Resource Center Manager Claristine Pinckney, who reported to Mr. Stephens.

12.     On or about January 2016, Plaintiff was promoted to Resource Center Specialist and served in that role from January 2016 to April 2017, reporting to Ms. Pinckney and Resource Center Supervisor Coral Morris.  In this role, Plaintiff no longer was assigned to support specific attorneys and had increased responsibilities

3

and independence.  Plaintiff also had to juggle a queue of requests from any attorney in the firm, including being responsible at times for delegating incoming requests to other Resource Center personnel, and did so successfully.

13.    During his tenure in the Resource Center, Plaintiff was often complimented for his speed and efficiency, with attorneys telling him he was the fastest on the team and even requesting him specifically because, as Ms. Pinckney once said, his name had become synonymous with "Alston & Bird Top Echelon Service."   When Resource Center Supervisor Coral Morris was out on PTO, she usually assigned Plaintiff to perform the duties of delegating incoming requests to Resource Center personnel.

14.    At all times when working in the Resource Center, Plaintiff followed a standard process for reporting overtime: in situations where Plaintiff needed to work overtime, he would reach out to his supervisor via email, explain the business need using standardized language, and ask for approval of the overtime.

15.    Plaintiff submitted these emails before working the overtime whenever possible, but in situations where this was not possible due to exigent circumstances (such as a last-minute urgent attorney request), he sent these emails after working the overtime.

16.    At all times during the 3.5-year period when working in the Resource Center, Plaintiff accurately reported all hours worked, including overtime hours. To the best

of Plaintiff's recollection, he worked overtime approximately every other week on average, and all overtime was accurately reported.

17.    When working in the Resource Center, Plaintiff was never disciplined for working unauthorized overtime or for the way in which he reported it, nor was Plaintiff ever described as inefficient or lacking in ownership. To the contrary, Plaintiff consistently received stellar performance reviews, above-standard annual raises, and had developed a reputation for excellence throughout the firm both within and beyond the Resource Center staff.

18.    In 2015, Plaintiff was given a firm "ABBY" (Alston & Bird's Best in Year) award for outstanding service in connection with his translation assistance on a pro bono matter.

19.    Plaintiff was given a second ABBY award in 2016 for "Service Moment of the Year" in connection with his top echelon service to a pro bono client.

20.    Director of Human Resources Michael Stephens later remarked on two separate occasions that he had never heard of the same person winning two ABBY awards. He said this once shortly after the second award was received and again after Plaintiff was nominated for two more ABBY awards in early 2017.

21.    In approximately early 2017, citing Plaintiff's reputation for top echelon service, Director of Human Resources Michael Stephens approached Plaintiff and

encouraged him to apply for a Pro Bono and Community Services Coordinator position, reporting to Cheryl Naja, Director of Pro Bono & Community Service.

22.    Plaintiff was not selected for that role, but when an HR Coordinator position became available, Mr. Stephens approached Plaintiff again and invited him to apply.

23.    Plaintiff was selected for the HR Coordinator position and began that role on or about April 2017, reporting to Brennan Fulton, who reported to Mr. Stephens.

24.    During the period from April 2017 to November 2017 in the HR Coordinator role, Plaintiff worked approximately 1-2 hours a week of overtime on average, and to his best recollection, reported it accurately.

25.    While there were some differences between the Resource Center Specialist and the HR Coordinator role (for example, Plaintiff was given a laptop and was permitted to work remotely for the first time), Plaintiff continued to report his overtime in the same general way he had done in the Resource Center, by sending emails to his supervisor in advance of working the overtime where possible, and afterward where not feasible due to exigent circumstances. Ms. Fulton approved his overtime and to Plaintiff's recollection, never suggested to Plaintiff that he was inefficient or that the overtime was unnecessary.

26.    Ms. Fulton and Mr. Stephens considered Plaintiff a strong performer in the HR Coordinator role and had expressed this to Plaintiff.

27.    On or about November 2017, Mr. Stephens approached Plaintiff again, inquiring about his interest in a Diversity & Inclusion Coordinator position that had recently become available. Plaintiff expressed enthusiasm at the opportunity.

28.    The firm, at Mr. Stephens' direction, changed the title of the Diversity & Inclusion Coordinator position to Diversity & Inclusion Administrator.   The Diversity & Inclusion Administrator's duties were fundamentally identical to the Diversity & Inclusion Coordinator position, and like the Diversity & Inclusion Coordinator role, the Diversity & Inclusion Administrator's role ("D&I Administrator Role") was non-exempt.

29.    Mr. Stephens told Plaintiff that a reason for the title change was that he wanted to make clear that the role change was a promotion and not a lateral transfer. Mr. Stephens also referenced the level of responsibility in the role.

30.    On information and belief, the title change was actually motivated by the knowledge that this title would result in Plaintiff being widely understood to be an FLSA-exempt employee, giving "internal clients" license to expect Plaintiff to work all hours without incurring additional costs to the Firm, and to criticize his performance based on that expectation, thereby forcing Plaintiff to underreport his hours or be labeled an underperformer and risk termination of employment.

31.    Within the firm, "Coordinator" is a common title that attorneys and staff recognize as non-exempt and overtime-eligible.

7

32.    "Administrator" is not a common title in the Firm and there was no direct analogue within the firm to it. Attorneys seeing Plaintiff's title would reasonably have assumed him to be an exempt employee and would have no way of knowing that he was nonexempt or what he earned, as it was against the firm's policy to discuss compensation and was understood that doing so could be grounds for termination.  Plaintiff was later informed by several attorneys that they in fact believed him to be an exempt employee.

33.    Prior to Plaintiff's accepting the D&I Administrator Role, the Diversity & Inclusion Coordinator role had suffered from severe attrition, having turned over three times in the last twenty-four months.  The individuals who most recently held the role left because they were overwhelmed with the high volume of work as the only full-time role dedicated to diversity, equity, and inclusion within the firm, and were nonetheless unfairly disparaged as disorganized and inefficient.

34.    When Plaintiff accepted the D&I Administrator Role, Plaintiff was the only full-time employee dedicated to diversity, equity, and inclusion ("DEI") (at any level, exempt or non-exempt) until March 2020.

35.    Shortly after Plaintiff's acceptance of the D&I Administrator Role, Cari Dawson, a partner who co-chaired the firm's Diversity & Inclusion Committee, sent an email to the firm's Diversity Steering Committee of over 20 partners, announcing Plaintiff as the firm's first-ever Diversity & Inclusion Administrator. Plaintiff was

8

already well-known throughout the firm for his excellent, responsive, and efficient service, and the email served as a *de facto* advertisement to attorneys that Plaintiff was available for work.

36.    Though Plaintiff reported to Mr. Stephens, anyone in the firm was able to reach out to Plaintiff directly and assign him work, which he was then expected to "own."

37.    For example, by the end of 2018, at least 50 partner-level attorneys had a Diversity-related leadership function that would warrant assigning work to Plaintiff on a regular basis, and it was generally in their interest to do so rather than to assign administrative tasks to their own practice assistants, to free the latter up for client work and because they believed Plaintiff to be an exempt employee.

38.    At all relevant times, the Firm had approximately 21 practice groups, each of which had at least one, and up to four, designated Practice Group Diversity Partners ("PGDP"), who would regularly reach out to Plaintiff with tasks to perform, such as requests that Plaintiff manually generate interactive excel sheets showing diversity metrics of their group compared to the firm as a whole, planning and coordinating unconscious bias training, and event planning.

39.    The Firm has nine regional Diversity & Inclusion Committees, and each committee is co-chaired by two partners.  These committee co-chairs would reach

out to Plaintiff on their administrative needs, including planning events and sponsorships.

40.     The Firm has nine regional Women's Initiative Committees, and each committee is co-chaired by two partners, who would also reach out to Plaintiff for updates on their budgets and other requests similar to the regional D&I Committees.

41.     Plaintiff realized the position involved far too much work for one person to accomplish it all, let alone in a 40-hour workweek. Within the first few months of starting the position, he began sounding the alarm to Mr. Stephens and others that more support was needed, and in particular, more dedicated staff for Diversity & Inclusion, and repeated this consistently during his time in the role.

42.     Accustomed to a standard process for requesting overtime in the Resource Center, Plaintiff initially sent Mr. Stephens similar emails outlining the business case for overtime but stopped doing so at Mr. Stephens' direction.

43.     Specifically, Mr. Stephens told Plaintiff on several occasions early on after Plaintiff started reporting directly to him in the Administrator role that it was unnecessary for Plaintiff to send these overtime-related emails because the business needs for overtime were self-evident, and that Mr. Stephens found these emails annoying and did not have time to review them.

10

44.   Mr. Stephens also admonished Plaintiff beginning in early 2018 that if he wanted to advance, he would need to demonstrate his willingness and ability to get the job done without getting paid extra for it.

45.   Wanting to fulfill Mr. Stephens' stated expectations and hoping to advance within a firm where he had been extremely successful and was extremely committed, Plaintiff began underreporting his overtime.

46.   Ms. Dawson, who likely believed that Plaintiff was FLSA-exempt, would provide critical feedback to Plaintiff "just like I would any associate," making clear that Plaintiff could not meet her expectations unless he worked like one.

47.   During 2018 and 2019, Plaintiff worked an average of at least 9 hours of overtime per week and in accordance with Defendant's expectations and direction, reported significantly fewer.

48.   Instead of hiring more administrative support for DEI, the Firm created more DEI-related tasks without providing any additional support resources, significantly increasing Plaintiff's workload.

49.   In March 2020, the Firm hired one of its former partners who had left the firm (Angela Payne James) into a full-time, non-client-facing Diversity & Inclusion role as, but added no additional support resources.

50.   Ms. James had few options but to rely heavily on Plaintiff both to get her up to speed, as well as for administrative support, as her designated practice assistant

was completely overworked and overwhelmed, assigned to multiple other attorneys and, at the firm's direction, prioritizing client billable work.  Further, until July 2021, Ms. James understood (as the Firm had designed) that Plaintiff was a salaried exempt employee and likely believed he was making a higher salary than was the case, with no means to discover otherwise due to firm policy.

51.   Defendant's hire of a dedicated partner-level Diversity & Inclusion role predictably entailed a significant increase in workload for Plaintiff, both in the short term for her onboarding, and in the long term because Ms. James was specifically hired for the purpose of developing the function at the Firm. All of this would require increased resources, something that was inevitable and foreseeable to the Firm when it decided to create the role. By creating the role without budgeting for additional support resources, the Firm set Ms. James up for an impossible task that would require overburdening existing resources.

52.   Further, Ms. James' highly-publicized appointment into the role raised the bar internally, motivating the many co-chairs of the regional Diversity & Inclusion Committees and the regional Women's Initiative Committees to double down on their own efforts.

53.   Plaintiff's workload starting around mid-2020 became even more unsustainable, as DEI-related inquiries spiked dramatically following increased public attunement after George Floyd's murder in late May, continuing to rise in

response to incidents of anti-Asian violence and an executive order limiting diversity trainings for federal contractors in the fall.

54.    During the second half of 2020, the Firm's clients began sending diversity surveys to their suppliers at an unprecedented volume, and diversity questions would appear with a dramatically increased frequency.

55.    Despite numerous requests from Plaintiff during this period, and upon information and belief, also from Cathy Benton, Ms. James, and other Diversity stakeholders in the firm, Defendant did not supplement resources on DEI.

56.    To the contrary, A&B consistently expressed unwillingness to incur additional cost to support the department, and instead of adding resources, the additional burdens were distributed among Plaintiff (who was expected to work off the clock to get it done) and other exempt employees were asked to pitch in to do the work so that the Firm would not have to pay any additional wages.  These employees had the word "Diversity" added to their titles but on information and belief, were not paid more for their efforts, and simply had to add it to their already-full plates.

57.    This was consistent with the Firm's larger pattern of shifting financial burdens onto the least powerful within the organization during a time of utmost global vulnerability during an unprecedented pandemic; A&B announced to the staff that

they would not be increasing salaries for staff in 2020 (though attorneys continued to receive bonuses and raises).

58.   Not only did A&B fail to increase staff compensation, but, at least in Plaintiff's case, it did not even bother to conduct performance evaluations. When Plaintiff inquired about his performance after the standard self-evaluation process was not initiated, Mr. Stephens responded "if what you're wanting is something in writing saying you're doing a great job, Angela has laid this out in multiple emails telling you how you're doing great, and expressing appreciation for all the work you've done in this difficult time with an increased workload."

59.   Despite this, whenever Plaintiff attempted to raise the issue of overtime, Mr. Stephens would retaliate against Plaintiff for requesting overtime by making Plaintiff feel guilty that these exempt individuals were having to spend time on DEI admin tasks, all of which were cast as Plaintiff's responsibility, and but for his inefficiency they would not have to do his work. Others (who did not know Plaintiff was non-exempt) echoed these types of comments. While their frustration was understandable given Defendant's unwillingness to properly resource DEI, considering it a "cost center" despite its critical role in preserving key client revenue, this added more pressure for Plaintiff to work more hours without reporting them.

60.   As the DEI-related workload increased, Plaintiff would receive increased criticism about prioritization, efficiency, and time management, because (in addition

to the above shaming of Plaintiff when exempt individuals were assigned overflow tasks) the large number of attorneys and supervisory staff who assigned Plaintiff work were all dissatisfied when Plaintiff would do work for someone else.

61.    When Plaintiff would inquire about overtime or additional resources, Mr. Stephens continued to repeat to Plaintiff that to prove himself "worthy of advancement" he would have to prove he could do the job without the expectation of getting paid for his efforts.

62.    For example, Plaintiff on occasion would reach out to Mr. Stephens if an urgent request came in during the evening. When he did so, Mr. Stephens would respond, for example, "this seems like something that can wait until tomorrow," knowing that Plaintiff would need to get it done off the clock anyway because of his other workload.

63.    There were no processes in place to curate Plaintiff's workflow, nor did Defendant at any time attempt to create any.  To the contrary, this burden was placed squarely on Plaintiff at all times, despite that Plaintiff was an hourly non-exempt employee with no discretion or authority to make that type of judgment-based decisions. But Plaintiff's raising of priority conflicts would often result in additional work for Plaintiff, who was then asked to justify the claim of conflicting priorities by creating a job matrix or similar. Plaintiff did this multiple times beginning in

2019, hoping that it would result in his supervisors' successful advocacy for more help, but instead, Defendant weaponized it to justify calling Plaintiff inefficient.

64.     A common situation was that Plaintiff would receive two requests marked immediately urgent at once and would seek guidance from Mr. Stephens and/or Ms. James about which was more urgent. Plaintiff would invariably receive a response that they were both urgent, and asked what Plaintiff was doing that he could not accomplish them both on the timetable provided.

65.     Ms. James, who believed Plaintiff was exempt at the time, would make comments referring to all-nighters she worked when she was an associate, such as in one meeting with Mr. Stephens and Plaintiff present, stating "how I was able to be successful was that sometimes I just knew I needed to pull an all-nighter in order to get the work that needed to be completed done before the deadline; and if that's something you need to do as well, in order to stay on top of the workload, then you should do it as well."

66.     In one particular meeting when she made this comment in the weeks leading up to Plaintiff's July 2021 performance review, Plaintiff even asked to be reclassified as salaried/exempt so that he could pull the all-nighters as recommended by Ms. James without being reprimanded for asking for overtime. Ms. James looked surprised, as on information and belief she had no idea he was non-exempt until that moment. Mr. Stephens responded that the firm was not in a position to make that

change at this time, and as Ms. James was not Plaintiff's reporting supervisor, and her department (which had no dedicated support employees other than Plaintiff) was repeatedly denied budget increases, she lacked the resources, bandwidth, and authority to do anything about the situation.

67.     When Plaintiff's recent predecessors in the Diversity & Inclusion Coordinator role had been similarly overwhelmed, they were portrayed (unfairly) as disorganized and inefficient. Plaintiff knew that reporting the actual hours he worked would only lead to the same (false) accusations and could jeopardize his future at an organization that he had hoped to remain with for his entire career. Plaintiff's fears that he would be disparaged falsely were later proven to be accurate.

68.     Another common refrain from Mr. Stephens when Plaintiff mentioned the impossible workload or overtime was that the firm was "trying to cut back on overhead," often specifically instructing Plaintiff not to ask for overtime because

69.     Mr. Stephens also frequently told the HR department in group settings that the firm's leadership saw HR as pure overhead, and not an asset because they did not bring money into the firm.  In the aftermath of one such occasion (to Plaintiff's recollection in November-December 2019), one late Friday evening when Plaintiff was obviously working overtime, he asked Mr. Stephens if it was okay to log it, and Mr. Stephens said that "here and there 2-3 hours is fine."

70.     Plaintiff understood that Mr. Stephens, compelled by the Firm's unreasonable budgets and taking advantage of Plaintiff's heartfelt passion for and commitment to the subject matter, was instructing him to report as little overtime as possible despite knowing that the work Plaintiff was performing well exceeded reported hours.

71.     The statements of Mr. Stephens and Ms. James (the latter of whom did not then know that Plaintiff was non-exempt) regarding efficiency, priorities, and repeated reference to others who "were not getting paid extra" led to extreme pressure on Plaintiff to work more and more hours off the clock over the course of 2020.

72.     From January to May 2020, Plaintiff worked an average of at least 11 overtime hours a week, and in accordance with Defendant's expectations and direction, reported significantly fewer.  From May to December 2020, Plaintiff worked an average of at least 15 overtime hours a week, and in accordance with Defendant's expectations and direction, reported significantly fewer.

73.     The DEI-related workload steadily increased through early 2021, and everyone on the department was overtaxed and overstretched—lacking proper administrative support from the Firm, they expected Plaintiff to support all of them and were increasingly critical of Plaintiff when he was unable to accomplish his unmanageable workload, replete with conflicting instructions, alone.

74.     Plaintiff was told that whenever a client survey comes in, he should drop everything to work on that survey, but Ms. James would assign him "special projects" that she would tell him needed his immediate and undivided attention for several hours.

75.     Ms. James and Mr. Stephens issued conflicting directives to Plaintiff and then chastised him for "time management" when he was working on the other's stated priority.  Further complicating matters was that (while Plaintiff was told that all client surveys were of immediate urgency) client surveys from high-revenue clients were considered more important than from lower-revenue clients according to a color-coded system that Plaintiff was asked to incorporate.

76.     Mr. Stephens, Ms. James, and Plaintiff's other supervisors and "internal customers," also under the strain of a crushing workload and Defendant's longstanding unwillingness to resource DEI appropriately, became increasingly overworked themselves, and impatient with Plaintiff who was the only full-time administrative support for DEI and widely regarded as exempt (except by Mr. Stephens) and highly paid. Due to the policy against discussion of compensation, Plaintiff dared not confirm, let alone correct, this perception.

77.     For example, Mr. Stephens would make comments to Plaintiff such as "I'm sick of doing everybody's job, including yours."

78.    Mr. Stephens, Ms. James, and others would regularly email Plaintiff outside of his scheduled work hours, including evenings, weekends, and while he was on PTO, and (as would soon be documented as part of a formal performance plan) would become dissatisfied if he waited until normal business hours to respond.

79.    In an effort to juggle an impossible volume and minimize constant reprimand from multiple sources with conflicting priorities, Plaintiff worked even longer hours without reporting them, but because his constant responsiveness on nights and weekends indicated that he was obviously working some amount of overtime, he struggled to report an "acceptable" number of hours as instructed by Mr. Stephens.

80.    During this period, Mr. Stephens would occasionally state conspicuously in group settings that off-the-clock work was not permitted, in a manner that struck Plaintiff as odd and was usually on the heels of someone's termination or a headline. The performative manner and context in which Mr. Stephens made these statements to his subordinates suggested that this directive was intended for the HR team to apply to their internal customers and not to them individually, and further as a paper trail to defend the company and deter employees from exercising their rights.

81.    Further, that Mr. Stephens made these statements with full awareness of Plaintiff's off-the-clock work and the threats and criticism to which Plaintiff was subject in connection with his alleged "inefficiency" was in further attempt to insulate himself and Defendant from responsibility for requiring Plaintiff to work

off the clock, by scaring Plaintiff with the possibility of being blamed for unauthorized off-the-clock work, even with knowledge that Plaintiff had no realistic alternative.

82.    In July 2021, Plaintiff attended what he had expected to be his annual review, but had not completed the typical process of computer-based self-evaluation on a numerical scale followed by manager evaluation on the scale with comments from specific individuals, which he had completed in past years.  Instead, he showed up to a scheduled meeting and was presented with a "performance plan" document without numerical performance evaluation or comments attributed to particular supervisors.

83.    The performance plan document (attached as Exhibit 1) was in a form he had never seen before (having had excellent reviews in the past under the standard process), which contained comments not attributed to any particular individual, and that officially placed him on "probation," Plaintiff received a performance plan that placed him on probation, citing a number of alleged deficiencies involving time management and efficiency, in response to which Plaintiff pointed out again that the workload was impossible for one person to perform and more support resources for DEI were needed.

84.    Among the alleged deficiencies identified was "Working Unauthorized Overtime," and mentioning that "a large majority of [the approximately 275 hours

Plaintiff reported] of overtime was not preapproved by Angela Payne James or Michael Stephens which violates instructions given at previous coaching sessions on the preauthorization needed."

85.    This statement was completely pretextual; Mr. Stephens' instruction to Plaintiff was to <u>stop</u> requesting preapproval for overtime formally, as Plaintiff had been in that habit when he first began the position. Ms. James had only recently learned that Plaintiff was exempt. Rather, the performance review was reprimanding Plaintiff for violating the "instruction" not to report overtime at all, or to report *de minimis* overtime, while somehow (as the performance review insists in the paragraphs preceding) responding promptly and without error to an avalanche of DEI-related support requests as the only dedicated DEI administrative personnel in a law firm with nearly 800 attorneys.   Further, Mr. Stephens and Ms. James remarks to Plaintiff orally in the conversation were at odds with the written comments, acknowledging the increased workload, influx of surveys, and improvement in efficiency (the latter of which was the result of underreporting overtime).

86.    Another alleged deficiency identified in the performance review was "When your timecard is not consistent with your actual work schedule, it is considered to be a falsification of your timecard" and threatening "further disciplinary action, up to and including termination."

87.    Plaintiff perceived the reference to "not consistent with your actual work <u>schedule</u>," particularly when combined with the remainder of the performance review insisting that work product be error free and timely for all internal customers, as reinforcing the previous instructions to work off the clock, as the number of internal customers and volume of requests made it impossible for Plaintiff to ever accomplish his tasks within the "schedule" he was allotted.

88.    Even though Plaintiff submitted his timecards weekly when required, the performance review further admonished Plaintiff that "waiting until your timecard is due is an ineffective work habit."  This too was pretext for retaliation and an effort to keep Plaintiff quiet, in recognition of the staggering amounts of unreported overtime that Mr. Stephens knew was going on.

89.    Defendant laid groundwork for this a few days earlier when Mr. Stephens brought up for the first time in a meeting witnessed by Ms. Fulton that he "needed to bring up a timecard issue" before Plaintiff's imminent performance review, in essence to create a paper trail for an otherwise random comment that Plaintiff would have seen as out of the blue.

90.    In the meeting with Ms. Fulton, Mr. Stephens asked Plaintiff questions about his timecards, stated that Ms. Fulton had to remind him, and then ending the meeting with Mr. Stephens asking Plaintiff to do a better job of completing timecards daily and not to log overtime without prior approval from Ms. James or Mr. Stephens.

91.    In reality, Plaintiff's "internal customers" constantly hounded him to attend to an impossible volume of requests, and if Plaintiff had attempted to complete his timecard daily instead of responding to an email, Plaintiff would have been reprimanded—Realistically, Plaintiff's only time for completing his timecard was off the clock, usually on weekends.

92.    On information and belief, Defendant included timecard and overtime violations in Plaintiff's performance review knowing that Plaintiff had worked substantial overtime off the clock as required by Defendant (which was visible to Defendant given the frequency, timing, and volume of emails to and from Mr. Stephens, Ms. James, and other management), but wanting to further pressure Plaintiff to report even fewer of the hours that he worked while preempting Plaintiff's ability to raise a claim for unpaid overtime.

93.    On or about August 25, 2021, a coworker informed Plaintiff about a "Diversity Manager" position that had been posted.

94.    Mr. Stephens did not tell Plaintiff that the position had been posted (despite that Stephens had informed the Plaintiff about the previous openings before they were even officially posted).

95.    The Diversity Manager job description appeared fundamentally similar to Plaintiff's existing duties, but reframed as managerial in nature.

96.    Assuming the Diversity Manager role would be in addition to the Administrator role, Plaintiff wished to apply for the Manager role but understood firm policy to prevent anyone on a performance plan status from applying for internal openings.  When he nonetheless asked Mr. Stephens for permission to do so, Mr. Stephens declined, saying "you keep going backwards when we need you to go forward."

97.    On information and belief, Defendant, knowing that the nonexempt Diversity & Inclusion Administrator role could not possibly be performed in a standard workweek, but not wishing to pay additional wages for it, restructured Plaintiff's role as exempt, and put Plaintiff on a formal performance plan to prevent Plaintiff from applying for it, in retaliation for Plaintiff's raising FLSA-related concerns about his hours.

98.    Given the unusual actions and timing in connection with Plaintiff's first performance improvement written plan in eight years, followed immediately by posting a position for which Plaintiff was conveniently ineligible to apply given the performance plan, Plaintiff believed he was the victim of unlawful treatment and raised the issue with Human Resources (CHRO Cathy Benton, Mr. Stephens' direct supervisor), requesting an investigation.

99.    After Plaintiff submitted the complaint to Human Resources, Mr. Stephens, who had been linked to Plaintiff on social media since approximately 2015,

immediately and without explanation, disconnected from Plaintiff on two separate sites (Facebook and LinkedIn). Plaintiff construed this as a retaliatory action, indicating that Plaintiff would no longer be accepted in the department, and was tantamount to constructive dismissal.

100.   Only a few days after Plaintiff had lodged an official concern, Ms. Benton informed Plaintiff that the investigation had been concluded with a finding that Plaintiff's concerns were unsubstantiated, without providing any detail. Plaintiff accepted the result, and in light of the social media sought assurances that he would be treated fairly going forward and did not receive them.

101.   Plaintiff considered his performance plan and inadequate response to his repeatedly-expressed hours concerns to be a constructive dismissal, and told Ms. Benton on Thursday, September 2, 2021, that he would leave the Firm on September 17, 2021.

102.   On September 3, Defendant confirmed in a letter that Plaintiff's last day was September 17, agreeing to pay him for an additional two weeks in exchange for signing a release of claims on or before Friday, September 10, 2021. To offer severance in this situation was highly unusual for the Firm, evincing that Plaintiff was constructively dismissed and that Defendant was aware of the off-the-clock work.

103.   Defendant terminated Plaintiff's systems access unexpectedly as of approximately September 8, the day after Plaintiff had informed them that he did not intend to sign the release.

104.   During 2021, Plaintiff worked an average of at least 16 hours a week of overtime, and in accordance with Defendant's expectations and direction, reported significantly fewer.

105.   On information and belief, since Plaintiff's departure, Defendant has hired a Diversity Manager that Defendant classified as exempt, and does not intend to replace Plaintiff's position, in an effort to get unlimited work out of the lowest number of individuals possible and to avoid hiring the number of individuals and/or paying the overtime that would be required to provide proper administrative support to a DEI department.

## STAFF CONFIDENTIALITY AND ARBITRATION AGREEMENT

106.   On information and belief, A&B requires all of its non-attorney staff, including hourly workers such as Plaintiff (whose 2013 hourly wage was $16.41) and even workers paid lower wages than Plaintiff, to sign a document entitled "Confidentiality and Arbitration Agreement – Staff" on commencement of employment (the "Staff Confidentiality Agreement"), in the form attached as Exhibit 2.

27

107.   The Staff Confidentiality Agreement states not that it is in consideration for employment or continued employment by the Firm, but that it is "in consideration for the salary or wages to be paid to the Employee by Alston & Bird in connection with his or her employment."

108.   By its terms, the Staff Confidentiality Agreement misleads hourly staff into a reasonable belief that the Firm can withhold already-accrued wages or salary unless they are willing to sign the document, thereby coercing signature on false pretenses.

109.   The Firm does not make employees aware of the existence of the Staff Confidentiality Agreement until shortly before their first day of work (maximum a few days), when it is sent to them within a larger packet of required onboarding paperwork, without specific attention called to it.

110.   Staff typically do not return the agreement until they have already accrued wages that the Firm cannot lawfully withhold, usually hours or days after they have started work, and in any event long after these employees have exerted sufficient reliance on their employment with the Firm such that they have no meaningful choice but to sign, in anticipation that wages imminently to be accrued could be withheld if they declined to sign.

111.   Under the Staff Confidentiality Agreement, employees must agree to settle all disputes pursuant to "the Commercial Arbitration Rules of the American Arbitration Association."

112.  The Staff Arbitration Agreement further states that "[a]ll costs of the arbitration shall be allocated by the arbitrator," leaving reasonable employees aware of the prospect that they would have to pay.

113.  Use of AAA's more costly and complex Commercial Arbitration Rules instead of its Employment Rules in an agreement for hourly staff serves no purpose other than to intimidate employees and deter them from raising legal rights, and to increase barriers to their retaining legal counsel.

114.  The Staff Confidentiality Agreement is presented as part of standard onboarding and fails to put employees on any notice whatsoever of the possibility that by signing the document, they will waive meaningful legal rights in perpetuity. Then Staff Confidentiality Agreement makes no mention of the possibility to take time to review the agreement or that they may wish to review it with counsel.  Nor are employees given any meaningful time to do so, even if they wished to do so.

115.  Notably for purposes of this action, the Staff Confidentiality Agreement does not put employees on any notice that it covers wage and hour or compensation-related claims.

116.  To the contrary, by combining the "confidentiality" and "arbitration" concepts into one agreement, and relegating the binding-arbitration provisions to two paragraphs in the middle of the document, beginning with "Any controversy or claim arising out of or relating to *this Agreement, or the breach thereof,*" (emphasis added),

it further misleads employees into associating the arbitration clause with the confidentiality provision, and distracts them from thinking about what types of claims might be included in the afterthought, ", or arising out of or relating to Employee's employment by Alston & Bird."

117.   The Staff Confidentiality Agreement fails to put employees on notice that arbitration proceedings would be nonpublic, which further reinforces that it cannot be construed as a knowing and voluntary waiver of FLSA claims.  Courts routinely deny approval of FLSA settlements that require confidentiality due to FLSA's remedial nature, and employees cannot waive their rights to a public forum for FLSA claims without explicit notice of same.

118.   As Plaintiff witnessed during his tenure as HR Coordinator, Defendant makes express efforts to deter staff from reading the Staff Confidentiality Agreement carefully, and to mislead them from understanding its scope, advising employees that the paperwork is "standard," referring emphatically to the attorney-client privilege and the nature of a law firm environment, and likewise falsely advising employees that the necessity for binding arbitration is endemic to law firm environments.

119.   Expectedly under the circumstances, the vast majority of employees do not ask any questions about the Staff Confidentiality Agreement.  For the minority of employees who do ask questions about the Staff Confidentiality Agreement, they are

referred to Mr. Stephens or another manager in the HR department, who reiterates the "standard" nature of the paperwork and the attorney-client privilege as the justification.

120.  After a new employee signs the Staff Confidentiality Agreement on hire, the signed copy is filed away and never mentioned again, nor revisited or reaffirmed explicitly if a staff member changes positions or is promoted.

121.  According to the Firm's records, Plaintiff signed the Staff Confidentiality Agreement on June 15, 2013.

122.  Plaintiff does not deny signing the Staff Confidentiality Agreement, but he did not remember doing so specifically, as his signature took place almost ten years ago and as part of standard onboarding..

123.  Critically, Plaintiff understood the Staff Confidentiality Agreement to pertain to breaches of confidentiality or privilege, and never at any point understood it to encompass FLSA claims.

124.  At no point after June 2013 did the Firm remind Plaintiff of the Staff Confidentiality Agreement's arbitration provisions, including when it asked Plaintiff to sign a release on his exit, in exchange for two weeks' pay.

125.  Plaintiff was only made aware of Defendant's intent to compel arbitration in reliance on the Staff Confidentiality Agreement as of December 20, 2021, when

Defendant's and Plaintiff's respective counsel had already been engaged in settlement negotiations for over a month.

## COUNT I: VIOLATION OF FLSA

126.   Plaintiff worked in excess of 40 hours per week almost every week he was employed in the Diversity Administrator role, beginning on or around November 2017.

127.   A substantial portion of Plaintiff's work was related to the movement of information and data between states, and therefore Plaintiff was employed by Defendant in interstate commerce.

128.   Plaintiff was not subject to an exemption from the overtime requirements of the FLSA.

129.   Plaintiff was entitled, under the FLSA, to receive overtime pay at one and one-half times Plaintiffs' regular hourly rates for all hours worked in excess of 40 hours per week.

130.   Defendant failed to pay Plaintiff one and one one-half times Plaintiff's regular hourly rates for all hours worked in excess of 40 hours per week as required by the FLSA.

131.   Defendant's failure to pay Plaintiff one and one-half times Plaintiff's regular hourly rate for hours worked in excess of 40 hours per week as required under the

FLSA was a willful violation of the FLSA for Defendant Employer's pecuniary benefit.

132.   As a direct and proximate result of Defendant's failure to pay Plaintiff's overtime wages as required under the FLSA, Plaintiff has suffered lost wages.

133.   Plaintiff is entitled to an award of liquidated damages in addition to his unpaid overtime wages because Defendant's failure to pay overtime was willful.


## COUNT II: RETALIATION UNDER FLSA

134.   Plaintiff incorporates the foregoing allegations as if restated herein.

135.   Defendant retaliated against Plaintiff for protected activity under the FLSA by, among other things, putting Plaintiff on a performance plan, failing to promote Plaintiff, and constructively dismissing Plaintiff.


## COUNT III: DECLARATORY RELIEF

136.   Plaintiff incorporates the foregoing allegations as if restated herein.

137.   Plaintiff did not voluntarily agree to arbitrate his FLSA claims.

138.   The Staff Confidentiality Agreement is substantively and procedurally unconscionable on its face, both in general and as applied to Plaintiff's FLSA claims, and it fails for want of consideration.

139.   The Staff Confidentiality Agreement is too vague and ambiguous to put Plaintiff and other employees on notice of the legal rights they are waiving.

140.   A valid case or controversy regarding the validity and enforceability of the Staff Confidentiality Agreement exists, as Defendant has made clear to Plaintiff that it intends to compel arbitration notwithstanding Plaintiff's position that the Staff Confidentiality Agreement is invalid and unenforceable.

141.   If Plaintiff had understood the Staff Confidentiality Agreement to lawfully require arbitration of his FLSA claims, which he did not, he would have been deterred from doing so due to its unconscionable terms including but not limited to, its improper attempt to incorporate the AAA Commercial Rules of Arbitration, which require each party to evenly split the costs of arbitration, rather than the AAA Employment Rules.

142.   Accordingly, Plaintiff asks this Court for a declaration that the Staff Confidentiality Agreement is unenforceable and invalid.

**WHEREFORE,** the Plaintiff prays as follows:

    a.  That process issue;

    b.  That a trial by jury to all issues be had;

    c.  Judgement against Defendant Employer for any and all general, special, and, where applicable, liquidated and punitive damages as allowed by law under each and every count and cause of action contained in this complaint;

    d.  For injunctive relief;

e.  For all costs of this action to be taxed against Defendant
    Employer;

f.  For all costs and attorney's fees to be awarded to Plaintiff;

g.  That damages for lost wages, benefits, and other compensation,
    plus interest thereon at the statutory rate be awarded to Plaintiff;

h.  That equitable relief in the form of reinstatement or front pay, as
    the Court deems appropriate be awarded Plaintiff;

i.  That witness fees, and all costs of this action be awarded
    Plaintiff; and,

j.  For any and all other and further relief as this Court may deem
    just and equitable under the circumstances.

Respectfully submitted, this 14th day of February, 2022.

/s/ J. Stephen Mixon
J. Stephen Mixon
Georgia Bar No. 514050
steve@mixon-law.com
Attorney for Plaintiff

THE MIXON LAW FIRM
1691 Phoenix Boulevard, Suite 150
Atlanta, Georgia 30349
Telephone: (770) 955-0100

/s/ Bonnie Shira Levine
bonnie@verselegal.com
Georgia Bar No. 422055
Attorney for Plaintiff

VERSE LEGAL
135 Auburn Ave, Suite 204
Atlanta, GA 30303